DAVID D. LIN (DL-3666)
JUSTIN MERCER (JM-1954)
**LEWIS & LIN, LLC**
81 Prospect Street, Suite 8001
Brooklyn, NY 11201
David@iLawco.com
Justin@iLawco.com
Telephone: (718) 243-9323
Facsimile: (718) 243-9326

*Attorneys for Plaintiff*
DAVID YONTEF

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID YONTEF,<br><br>                  *Plaintiff*,<br><br>   vs.<br><br>JESSICA ROTHSCHILD,<br><br>                 *Defendant*. | Case No: 1:20-cv-2827<br><br><br>**COMPLAINT** |

Plaintiff David Yontef ("Mr. Yontef" or "Plaintiff"), by his attorneys Lewis & Lin LLC, for his complaint against Defendant Jessica Rothchild ("Rothschild" or "Defendant"), alleges as follows:

### STATEMENT OF CASE

1.      Plaintiff Mr. Yontef is a renowned businessman, entrepreneur and podcaster whose dictation of his personal life and connections with several television and film celebrities in a podcast formerly named "Out In The Wild with David Yontef & Jess Rothschild" was one of the fastest-growing and Top 10 podcasts in TV & Film categories on Apple Podcasts in the U.S. Plaintiff and Defendant Rothschild had an informal partnership and agreement to produce and create content for the "Out In The Wild with David Yontef & Jess Rothschild" Podcast.  After

Rothschild repeatedly violated the parties' agreement by, *inter alia*, unilaterally publishing unauthorized content on their platform including episodes featuring Mr. Yontef without his permission, Mr. Yontef ended their relationship and the podcast. Thereafter, Mr. Yontef created a new podcast venture: "Behind the Velvet Rope with David Yontef."

2.     Rather than cease use of Mr. Yontef's name and likeness with the show, Defendant instead hijacked all the audio content and episodes including Mr. Yontef and that he created for their former podcast, misleadingly stripped his name from the title of the show and started a competing podcast on the same platforms and channels as the old "Out In The Wild." Defendant then published promotional content and audio including Mr. Yontef's name and likeness without his permission or consent—while still collecting 100% of the advertising income for previous episodes with Mr. Yontef.

3.     As detailed below, this is an action pursuant to the federal Lanham Act and New York common law for preliminary and permanent injunctive relief and recovery of damages arising from acts of false advertising, unfair competition, and misappropriation of likeness, in connection with, *inter alia*, Defendant's theft and scheme to hijack Plaintiff's celebrity gossip and pop culture podcast business and likeness by (i) making certain misleading advertisements and promotional statements claiming her competing podcast business as still being associated with Plaintiff, (ii) manipulating and/or copying of imagery used with Plaintiff's former podcast, and (iii) the bad faith appropriation and use of Mr. Yontef's personal name and voice in advertisements and unauthorized audio content. Plaintiff seeks injunctive relief, damages, statutory damages, punitive damages and recovery of his costs and reasonable attorneys' fees.

## **PARTIES**

4.     Plaintiff Mr. Yontef is a well-known businessman, entrepreneur and podcaster

residing in the New York, New York.

5.      Upon information and belief, Defendant Rothschild is an individual residing in the State of New York, domiciled at 69 Fifth Avenue, Apt. 17A New York, New York 10003.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to the Lanham Act, 15 U.S.C. § 1051 et seq.  This Court has also subject matter jurisdiction, *inter alia*, pursuant to 28 U.S.C. §§ 1331, 1332(a)(2), 1332(a)(3), 1338 and 1367.

7.      This Court has pendent jurisdiction of the related state law claims asserted in this action pursuant to 28 U.S.C. § 1367 because they involve the same parties, they arise from the same operative facts common to the causes of action arising under the federal claims, and because the exercise of pendent jurisdiction serves the interests of judicial economy, convenience and fairness to the parties.

8.      This Court has personal jurisdiction over Defendant Rothschild because she is a resident of the State of New York.

9.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c), since some, or all, of the conduct that is the subject of this action occurred in this district.

## BACKGROUND COMMON TO ALL CLAIMS

### Mr. Yontef's Background, Reputation and Career in Entertainment

10.     As set forth below, Mr. Yontef is an extremely well-known businessman, entrepreneur, pop culture expert and, now, podcaster.

11.     A former business owner and law school graduate, for over a decade, Mr. Yontef was the president, owner, and CEO, of Advertising Executives Inc., a talent placement company which specialized in recruitment for executive positions at pharmaceutical advertising and

medical education agencies across the United States. In addition to building his personal brand, Mr. Yontef owes success in business to his resolve to make a name for himself as the top recruiter in the industry.

12.     In addition to his duties as a business owner, Mr. Yontef has used his distinctive legal name DAVID YONTEF™, both as his personal name and as a source of business identity for his career in media and entertainment

13.     Mr. Yontef's career in media and entertainment blossomed in 2010, when Mr. Yontef became a contestant on Bravo's popular television show, *Millionaire Matchmaker*.  Mr. Yontef's personality and likeness has made him attractive to show producers for appearances on similar Bravo shows and he had been in talks and production for his own VH1 show.  In addition, through his personal life and connections with several television and film celebrities, Mr. Yontef has become a pop culture expert and well-known figure in in the community of dedicated fans of Bravo's shows like *Real Housewives*, among others. He has tons of first-hand experiences with A-list celebrates and stars and is not shy to speak his opinion.

14.     Mr. Yontef's career in business, media and reality entertainment places a high degree of value on his goodwill and reputation, which is essential to establish his personal brand, DAVID YONTEF™.  In furtherance of maintaining his brand, Mr. Yontef is selective in which media ventures he engages with.

15.     Under the DAVID YONTEF™ Mark, Mr. Yontef has created and maintained social media profiles to promote his personal brand, business and services under said name and mark. He also has almost 22,000 followers on Instagram.

16.     Actual or perceived associations with Plaintiff's likeness or reputation has value, and concerns regarding the quality or nature of content authorized by Plaintiff may deter

Plaintiff's advertisers from using Plaintiff's media platforms or cause Plaintiff's celebrity connections (who have their own brands and images) to refuse to engage with him, and result in negative publicity, damage to his reputation, and loss of his goodwill.

**Defendant Meets Plaintiff to Discuss Mr. Yontef's Podcast Idea**

17.     In mid-March 2019, Defendant introduced herself to Plaintiff, who she recognized because he already had a large following of Bravo fans. Defendant is a web and user interface designer, who, prior to the events set forth herein, had little to know renown in media or the reality entertainment industry.

18.     Over lunch in late March 2019, Defendant queried Plaintiff has to why he took and posted so many pictures with Bravo celebrities and Plaintiff replied that he was interested in starting a podcast dedicated to his personal life and first-hand accounts with celebrities, gossip and pop culture.

19.     Defendant proposed to edit Plaintiff's proposed podcast and sourced appropriate software and equipment.

20.     Sometime in late March to early April 2019, Plaintiff and Defendant agreed that they would co-create and co-produce several episodes of a podcast which dictated Plaintiff's life and had interviews with A-list celebrities and guests known to and familiar with Mr. Yontef only. Plaintiff and Defendant agreed that, in order to offset the costs of producing the podcast, including Mr. Yontef's personal expenditure of funds to conduct onsite interviews across the country, that they would engage advertisers to play promotional materials on the podcast. Plaintiff and Defendant agreed that, in exchange for Rothschild's purported expertise and experience in audio engineering and editing, that they would split the profit of such advertisements.

21.     Thereafter, in or around in late March to late April 2019, Plaintiff develops and

drafts a content list for the podcast based exclusively Plaintiff's personal life with A-list celebrities known to and familiar with Mr. Yontef only.

22.    On or around early April 2019, Plaintiff and Defendant agree on the name for the podcast: "Out In The Wild." Plaintiff and Defendant develop a logo for the podcast together:



23.    The podcast cover image and logo include the DAVID YONTEF™ Mark.

24.    On or around early April 2019, Plaintiff and Defendant record first pilot episode of the podcast based on Plaintiff's content list.

25.    On April 12, 2019, Plaintiff and Defendant publish first episode on Apple Podcasts.

26.    At the time, Defendant maintained access to the RSS feed to publish subsequent episodes for the podcast on the platform, on the condition that she adhere to the parties' agreement set forth above.

27.    On or around April 14, 2019, in furtherance of their promotion of the podcast, Defendant created an Instagram account for the podcast, @outinthewildpodcast, and registered a domain name, <outinthewildpodcast.com>, to publish podcast content and promotional information.

28.     Around that same time, Plaintiff advertises and promotes the "Out In The Wild with DAVID YONTEF™ & Jess Rothschild" podcast on his popular Instagram account, further associating his personal brand with the content of the podcast.

29.     The podcast was an instant hit. Specifically, "Out In The Wild with DAVID YONTEF™ & Jess Rothschild" was one of the fastest growing and the number 7 podcast in the TV & Film category on Apple Podcasts in the U.S.  "Out In The Wild with DAVID YONTEF™ & Jess Rothschild" received copious media attention, mostly linked to its association with Plaintiff, and was referenced on several popular blogs and media outlets—including Bravo's own Instagram account.

30.     As result of this attention and renown, the public began to associate Out In The Wild with DAVID YONTEF™ & Jess Rothschild" with Plaintiff and his DAVID YONTEF™ Mark.

31.     Between April 2019 and November 2019, Plaintiff and Defendant recorded dozens of podcasts with celebrity guests known to or invited by Plaintiff Mr. Yontef.  Given Plaintiff and Defendant wanted to maintain regular interest in the podcast, they agreed to publish episodes on a weekly or bi-weekly basis, with Plaintiff and Defendant selecting every other episode from the catalog of recordings to publish. As the podcast's engineer, Defendant had access and control to feeds to publish each episode. However, the ultimate, creative decision over what would be published remained with Mr. Yontef.

32.     Then, on or around November 21, 2019, Defendant unilaterally deviated from the parties' agreement and published an episode that Plaintiff did not approve or authorize.

33.     At that time, Defendant violated their agreement and Plaintiff's trust by releasing such unauthorized content on the "Out In The Wild with DAVID YONTEF™ & Jess Rothschild"

podcast.  At all relevant times, Plaintiff repeatedly informed Defendant orally and in writing, via text message, that she did not have the authority to publish episodes using his name, voice or likeness without his express permission.

34.     As a result, Plaintiff presented an ultimatum that no other episodes or content would be released unless Defendant adhered to the episode schedule set forth by Plaintiff. Defendant agreed.

35.     Then, at some point in mid-December 2019, Defendant again violated her agreement and Plaintiff's consent to use the content, his name and likeness but publishing another unauthorized episode. Further, Defendant failed to remit to Plaintiff advertising revenues that had been received.

36.     At that point, on or around December 23, 2019, Plaintiff terminated the parties working relationship and again directed Defendant that she did not have authorization to release any more episodes of the "Out In The Wild with DAVID YONTEF™ & Jess Rothschild" podcast, nor any content with Plaintiff's name, voice or likeness. At the time, there are approximately 22 unreleased episodes of the podcast with Plaintiff's voice, name and likeness on them, that he had no intention would be published without his consent. Plaintiff also indicated that he wanted Defendant to forward his portion of outstanding advertising revenues for the podcast.

37.     Defendant again agreed.

**Mr. Yontef's New Podcast, "Behind the Velvet Rope"**

38.     Between January 1, 2020 to around February 9, 2020, Plaintiff recorded episodes of a new podcast without Defendant. On or about February 10, 2020, Plaintiff published his new podcast called "Behind the Velvet Rope" and announced on a story on his Instagram account that the old show, "Out In The Wild with DAVID YONTEF™ & Jess Rothschild," was over.

39.     Much like the original show, Mr. Yontef's new podcast venture was also an instant hit, generating buzz, activity on Apple Podcast charts and positive reviews.

**Defendant's Competing Businesses and her Wrongful Conduct**

40.     Rather than cease use of Mr. Yontef's name and likeness with the show, Defendant instead hijacked all the audio content and episodes including Mr. Yontef and that he created for their former podcast, and misleadingly stripped his name from the title of the show, "Out In The Wild."

41.     Indeed, on or around January 20, 2020, Defendant met with Plaintiff and stated that her plan was to take the 22 unreleased episodes with Mr. Yontef in them and "space them out" on her new podcast.  She further claimed that the times she records a new episode without Mr. Yontef in it, she plans to tell the audience he was either away, sick, sleeping or too lazy to be a part of that episode.

42.     Defendant admitted the episodes with Mr. Yontef are going to be the better ones, so her plan was to space those out as long as possible to retain listener interest in her new podcast by misleading the audience in to think that her iteration of the podcast had fresh, high-quality episodes with Mr. Yontef—as if he never left.

43.     Plaintiff did not consent to Defendant's plan or proposal. Indeed, as set forth above, Plaintiff never gave Defendant authority to release audio content featuring his name or likeness without express permission and consent.

44.     Undeterred, at some point in early February 2020, Defendant altered the content on the former podcast's website to remove the DAVID YONTEF™ Mark from the logo:

**<u>Former Logo</u>**                    **<u>Defendant's Current Logo and Cover</u>**

    

45.     Defendant then published promotional content, on the website <outinthewildpodcast.com>, on Apple Podcasts and elsewhere, as well as audio including Mr. Yontef's name and likeness without his permission or consent—while still collecting 100% of the advertising income for episodes with Mr. Yontef, none of which she has remitted to Mr. Yontef.

46.     As Defendant had access to the parties' former content feeds, she published the old episodes on her similarly named platform as if nothing had changed, giving the false impression that not only did Mr. Yontef endorse her new show, but that he was still part of it.

47.     Defendant then hijacked the parties' website <outinthewildpodcast.com> to not only advertise her new show (including the altered logo above), but to publish advertisements for previous episodes with Mr. Yontef's name and Instagram account:





48.     Mr. Yontef did not authorize Defendant to continue to use his name, likeness, voice or any audio content to advertise her competing podcast.

49.     In addition to altering the parties' former website, Defendant altered the parties' former Instagram account @outinthewildpodcast by removing the former logo with the DAVID YONTEF™ Mark, while publishing new content promoting her new competing podcast on the same account. Specifically, @outinthewildpodcast Instagram account contains pictures and images of Mr. Yontef with various celebrities commemorating his experiences as well as advertising old episodes with his voice—which Defendant no longer had authorization to publish, much less promote in concert with her new venture.

50.     Defendant's obfuscation of the truth continues to this day: she is still misleading the public as to the nature of her "new" show, in direct competition with Plaintiff's "Behind the

Velvet Rope" podcast by continuing to release "new" episodes from the authorized catalog of
shows featuring Mr. Yontef.

51.     For instance, from January 2020 to April 1, 2020, more than half of the episodes
that Defendant published on her "new" "Out In The Wild" platform are episodes that include Mr.
Yontef, without his permission or consent.

52.     The very reason that Plaintiff ended the old show, "Out In The Wild with DAVID
YONTEF™ & Jess Rothschild," was Defendant's unilateral publication of episodes that Plaintiff
did not approve nor consent. Why Defendant presumes that she can now publish additional
episodes from that catalog of unauthorized material without remuneration to Plaintiff or Plaintiff's
consent, while in direct competition with Plaintiff's new podcast, is both a mystery and malicious
violation of law.

53.     Defendant has also knowingly misappropriated the goodwill that Plaintiff brought
to the old "Out In The Wild" show by leveraging Plaintiff's friendships and connections with
celebrities as if they were her own.  For example, on or about February 19, 2020, after the
parties' split, Defendant published an episode on her "new" show with Kim D. from Bravo's
"The Real Housewives of New Jersey."  Plaintiff and Defendant recorded that episode with Kim
D. in the summer of 2019, prior to Defendant's breaches. Kim D. is a very close friend of
Plaintiff, and has no relationship to or with Defendant, either then or now.

54.     Thus, when Defendant published an episode with Kim D. and Plaintiff on her
"new" podcast on February 19, 2020—less than week after Plaintiff announced his new podcast,
"Behind the Velvet Rope" and informed the audience that the old podcast was "over"—the
public was extremely confused. Given the well-known friendship between Kim D. and Plaintiff,
it appeared that Kim D. had recently visited Defendant's podcast, instead of Plaintiff's new

podcast, "Behind the Velvet Rope."  As a result, Plaintiff fielded dozens of inquiries, messages and calls from fans and friends who were shocked that Kim D. had apparently chosen Defendant's show over Plaintiff's—when nothing could be further from the truth. Defendant simply wanted to mislead the public that her show was still creating the best content with the best guests, with Plaintiff's still there and/or with Plaintiff's approval.

55.     As a direct and proximate result of Defendant's misleading conduct described herein, a number of Plaintiff's former and current audience of listeners have been confused, refused to start and/or continue business with Mr. Yontef.  These listeners made their confusion known in comments on the hijacked @outinthewildpodcast Instagram account:



56.     Other reviewers have expressed their displeasure at Defendant's new podcast without Mr. Yontef in reviews on the parties' former Apple Podcast platform, pining for his return.

57.     Mr. Yontef has received no remuneration from Defendant for her unauthorized

use of his name, likeness and voice, and has suffered, and will continue to suffer unless enjoined, damages and reputational harm.

58.     While imitation is a form of flattery, Defendant's misleading appropriation of Plaintiff's content without authorization or remuneration has cause listener and advertiser confusion. The public thinks they are receiving a podcast endorsed by Mr. Yontef, when they are not. Indeed, by using the same logo imagery and content from the old podcast, Defendant did and intended to stoke that confusion.

59.     To date, Defendant has refused to comply with Plaintiff's demand that she cease using his content and to remit past (and current) advertising revenues to him.

60.     Instead, and in addition to earning general advertising revenue, on or around April 1, 2020 Defendant announced that she has converted and/or soon will be converting her "new" podcast to a membership subscription model (via the service Patreon), in order to generate additional income for herself alone.

## FIRST CLAIM FOR RELIEF
### Violation of the Lanham Act Under 15 U.S.C. § 1125(a)

61.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 60 as though fully set forth here.

62.     Defendant's publication of false and misleading statements about herself and her services, constitutes false designation and promotion in violation of 15 U.S.C. § 1125(a)(1)(B).

63.     Defendant's new "Out in the Wild" podcast is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendant with Mr. Yontef, or as to the origin, sponsorship, or approval of her services or commercial activities by Mr. Yontef, in violation of 15 U.S.C. § 1125(a)(1)(A).

64.     Defendant's publication of false and misleading statements about herself and her new podcast services, to wit: that she is associated with or authorized by Mr. Yontef, is likely to deceive people and consumers as to the nature and quality of Defendant's services.

65.     Defendant's publication and direct endorsement of false and misleading statements about Plaintiff, constitutes false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

66.     As set forth above, Defendant's website and Instagram advertisements regarding her new podcast were intended to promote the Defendant's new podcast (which competes with Mr. Yontef), while obfuscating the true nature of their use and degrading the reputation of their main competitor: Plaintiff Mr. Yontef.

67.     Upon information and belief, Defendant's conduct, was committed willfully, knowingly, maliciously, and in conscious disregard of Plaintiff's rights.

68.     The aforesaid conduct by Defendant has caused and, unless enjoined, will continue to cause, immediate and irreparable injury to Plaintiff's business, goodwill and reputation.

69.     Because Plaintiff's remedy at law is inadequate, Plaintiff seeks, in addition to damages, temporary, preliminary and permanent injunctive relief to protect his legitimate business interests. Plaintiff is reliant on his business reputation and his ability to maintain and grow his listener base in a competitive market and will continue suffering irreparable harm absent injunctive relief.

70.     As a direct and proximate result of Defendant's unlawful acts, Plaintiff has suffered irreparable damage to his reputation and will continue to suffer significant and irreparable reputational injury to media and podcast business, in addition to significant monetary damages in amounts to be determined at trial.

## SECOND CLAIM FOR RELIEF
### Common Law Unfair Competition – False Promotion

71.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 60 as though fully set forth here.

72.     Defendant's publication of false and misleading statements about herself and her new podcast services, to wit: that she is associated with or authorized by Mr. Yontef, is likely to deceive people and consumers as to the nature and quality of Defendant's services.

73.     The aforesaid conduct by Defendant has caused and, unless enjoined, will continue to cause, immediate and irreparable injury to Plaintiff's business, goodwill and reputation.

74.     Because Plaintiff's remedy at law is inadequate, Plaintiff seeks, in addition to damages, temporary, preliminary and permanent injunctive relief to protect his legitimate business interests. Plaintiff is reliant on his business reputation and his ability to maintain and grow his listener base in a competitive market and will continue suffering irreparable harm absent injunctive relief.

75.     As a direct and proximate result of Defendant's unlawful acts, Plaintiff has suffered irreparable damage to his reputation and will continue to suffer significant and irreparable reputational injury to media and podcast business, in addition to significant monetary damages in amounts to be determined at trial.

## THIRD CLAIM FOR RELIEF
### Common Law Unfair Competition – Misappropriation and False Description

76.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 60 as though fully set forth here.

77.     Defendants authored and/or are using on the website and Instagram account to

divert users searching for Plaintiff Mr. Yontef to Defendant's competing business and services.

78.    The false and misleading representations set forth above were made in the scope of commerce and in the context of promoting Defendant's competing podcast and media business.

79.    Upon information and belief, Defendant knew that Google and Apple Podcast, among others, display search results to users searching for the people and companies named in those titles and addresses, which results are highly ranked, and that such association with Mr. Yontef would attract listeners, while harming Plaintiff's reputation and business in this district and elsewhere.

80.    Upon information and belief, by posting the misleading associations with Mr. Yontef, including appropriating the same logo, Defendant intended to use these false statements as a means to generate business by turning interest away from Plaintiff and his podcast, and redirecting them to Defendant's competing podcast, also named "Out In The Wild".

81.    Moreover, Defendant's actions did harm Plaintiff and made Plaintiff believe that he would be damaged by Defendant's misrepresentations.

82.    Considering Defendants knew that her statements and content associating herself with Plaintiff were, at best, misleading, Defendant had no justification to assert the misrepresentations other than to harm Plaintiff's business by exploiting the earned reputation of Mr. Yontef, and coopting his content, likeness and business, as Defendant's own.

83.    These acts and others stated above constitute a pattern of common law unfair competition by, *inter alia*, false description and misappropriation, entitling Plaintiff to recovery of compensatory and punitive damages, in an amount to be proved at trial, including compensation for Plaintiff's time, effort and attorney's fees.

## FOURTH CLAIM FOR RELIEF
## Unfair and Deceptive Trade Practices in Violation of NY G.B.L § 349

84.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 60 as though fully set forth here.

85.     As set forth above, Defendant used or employed deception, fraud, false pretense, false promise, misrepresentation, and/or the knowing, concealment, suppression, or omission of material facts about Plaintiff, with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of services in violation of NY G.B.L § 349.

86.     The aforesaid acts by Defendant have caused and, unless enjoined, will continue to cause, immediate and irreparable injury to Plaintiff's business, goodwill and reputation.

87.      These acts and others stated above entitle Plaintiff to the recovery of compensatory and punitive damages.

88.     As a direct and proximate result of Defendants' past and continued wrongful acts, Plaintiff has been materially and substantially damaged in an amount to be proved at trial, including compensation for Plaintiff's time, effort and attorney's fees.

## FIFTH CLAIM FOR RELIEF
## Misappropriation of Likeness in Violation of
## New York Civil Rights Law §§ 50-51

89.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 60 as though fully set forth here.

90.      By reason of Defendant's actions described above, Defendant has used for purposes of advertising or trade, Mr. Yontef's image, voice, likeness and/or information.

91.     All of Defendant's activities, including her hijacking of Plaintiff's voice and name, and her alteration and publication of same, were done without the knowledge or consent of Plaintiff, and Defendant did not compensate Plaintiff for her unauthorized use.

92.     Not only did Defendant publish, from the State of New York, the website, Instagram account and various RSS feeds of her new podcast on dozens of platforms using Mr. Yontef's voice and content, but such content is accessible on the Internet and was available for use on a worldwide basis. Any person with a computer and an Internet connection, anywhere, including within New York State, has access to the content and advertisements including Mr. Yontef's voice and name.

93.     At all relevant times, such use was without Mr. Yontef's consent.

94.     As a direct and proximate result of Defendant's past and continued wrongful acts, Plaintiff has been materially and substantially damaged in an amount to be proved at trial, including compensation for Plaintiff's time, effort and attorney's fees.

95.     In addition, Plaintiff has suffered and will continue to suffer irreparable harm unless injunctive relief is granted.

## SIXTH CLAIM FOR RELIEF
### Breach of Contract

96.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 60 as though fully set forth here.

97.     As set forth above, at all relevant times, a valid agreement existed between Plaintiff and Defendant as to the dispense of advertising revenue for the former podcast, based on the content published thereon.

98.     To date, Defendant has not remitted to Plaintiff all of his due portion of advertising revenue after December 23, 2019.

99.     Further, Defendant continues to collect advertising revenue for content including Mr. Yontef, to which she has not remitted any to Plaintiff.

100.    As such, Defendant has breached her agreement with Plaintiff.

101.    As a result, Plaintiff has been damaged and continues to be damages by Defendant's breach, in an amount to be proved at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant awarding Plaintiff:

1.    Enter a judgment declaring that all Defendant's conduct violates 15 U.S.C. §1125(a);

2.    Enter a judgment declaring that Defendant's conduct constitutes unfair competition;

3.    Award Plaintiff all relief available under the Lanham Act for Defendants' violation thereof;

4.    Award Plaintiff actual damages in an amount to be determined at trial, but in no event less than $100,000, due to common law unfair competition;

5.    Award Plaintiff actual damages in an amount to be determined at trial, but in no event less than $100,000, due to unfair and deceptive trade practices;

6.    Award Plaintiff actual damages in an amount to be determined at trial, but in no event less than $100,000, due to misappropriation of likeness;

7.    Award Plaintiff actual damages due to breach of contract;

8.    Direct Defendant to perform an accounting of profits and revenues from advertising as a result of her publication of content including Plaintiff or Plaintiff's name or likeness;

9.    Award Plaintiff compensatory damages pursuant to the Lanham Act;

10.     Award Plaintiff punitive damages pursuant to the Lanham Act and the common law, due to Defendants' willful and wanton behavior;

11.     Enter a temporary and permanent order, enjoining Defendant from publishing the false promotion statements identified above, in relation to herself or Plaintiff, or any misleading statements similar thereto, and directing Defendant and her respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendant, to remove, delete, or otherwise disable such websites and content including Plaintiff or Plaintiff's likeness;

12.     Enter a temporary and permanent order, enjoining Defendant from using the DAVID YONTEF™ Mark in connection with her podcast business;

13.     Enter a temporary and permanent order, enjoining Defendant from using Plaintiff's voice, image or likeness in connection with her podcast business;

14.     Enter a temporary and permanent order, enjoining Defendant from using the mark "Out In The Wild," or anything confusingly similar thereto, in connection with a podcast, podcast content, social media, logos or imagery, or anything confusingly similar thereto, in connection with her new podcast business;

15.     Award Plaintiff reasonable attorney's fees, costs and disbursements in this civil action; and

16.     Enter such other and further relief to which Plaintiff may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

Dated:  Brooklyn, New York
         April 6, 2020

                           LEWIS & LIN, LLC

                           By: */s/ Justin Mercer*
                               David D. Lin, Esq. (DL-3666)
                               Justin Mercer, Esq. (JM-1954)
                           81 Prospect Street, Suite 8001
                           Brooklyn, NY 11201
                           Tel: (718) 243-9323
                           Fax: (718) 243-9326
                           Email: david@iLawco.com
                                      justin@iLawco.com

                           *Counsel for Plaintiff David Yontef*